UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Jane Doe[1],<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br><br>City of Rochester, New York,<br><br>　　　　　　Defendant. | No.: 6:24-cv-06209<br><br><br><br>**COMPLAINT** |

Plaintiff, Ms. Jane Doe, by and through her attorneys, J. Morgan Levy Firm, PLLC, by way of complaint against defendant City of Rochester, New York, alleges as follows:

## **<u>INTRODUCTION</u>**

1. This is an action pursuant to 42 U.S.C. § 1983 to recover damages plaintiff Ms. Doe suffered after defendant City of Rochester, New York (hereinafter "City of Rochester" or "City") intentionally discriminated against her because of her sex and in a manner consistent with defendant City's policy or custom of discrimination against women.

2. This is also an action against defendant City of Rochester for its violations of New York State Human Rights Law (NYSHRL) due to its discriminating against Ms. Doe on the basis of her sex/gender.

3. This is further an action against defendant City of Rochester for its violations of NYSHRL by discriminating against Ms. Doe on the basis of domestic violence victim status, refusing to provide reasonable domestic violence accommodations and leave to Ms. Doe, permitting harassment of Ms. Doe on the basis of her domestic violence victim status, and for retaliating against Ms. Doe for requesting and taking domestic violence leave.

4. This is also a claim against defendant City of Rochester pursuant to New York State Labor Law (NYLL) § 740 due to its retaliation against Ms. Doe after she alleged breaches of NYLL Article 27-a and its associated regulations at 12 NYCRR § 800.6 and requested help afforded by it.

5. This is further an action against defendant City of Rochester for negligence per se due to their failures to follow NYLL and NYSHRL.

---

[1] Plaintiff has been given a pseudonym to protect her privacy.

## PARTIES AND RELATED PERSONS

6. Ms. Doe is an individual residing in the state of New York[2].

7. Upon information and belief, defendant City of Rochester is a municipality located at City Hall, 30 Church Street, Rochester, New York, 14614.

8. The Rochester Fire Department (hereinafter "RFD") is an arm of the municipality, defendant City of Rochester.

9. The RFD is an "employer" as that term is defined by NYSHRL and NYLL.

10. The NYSHRL applies to all employers within the state, including the state and its political subdivisions.

11. According to the Diversity, Equity, Inclusion & Belonging statement on its website, "The RFD is committed to a culture that supports diversity, equity, inclusion and belonging"[3].

12. The RFD employs "over 500 diverse uniformed and non-uniformed members, who reflect the community as a whole..." and "13 engines, 6 trucks, heavy rescue, and support staff respond to help from 15 neighborhood fire stations[4]."

13. At all relevant times herein, Mr. Edgardo Santiago served as President of the Union, Rochester Fire Fighters Association Local 1071, IAFF, AFL-CIO, INC (hereinafter, "the Union").

14. At all relevant times herein, Mr. Stefano Napolitano was employed by defendant City of Rochester in the RFD and held the job title Fire Chief.

15. At all relevant times herein, Mr. Robert Shaw was employed by defendant City of Rochester in the RFD and held the job title Battalion Chief.

16. At all relevant times herein, Mr. Patrick Agostinelli was employed by defendant City of Rochester in the RFD and held the job title Battalion Chief.

17. At all relevant times herein, Mr. James Hartman was employed by defendant City of Rochester in the RFD and held the job title Executive Deputy Fire Chief of Operations (EDCO).

18. At all relevant times herein, Mr. Joseph Luna was employed by defendant City of Rochester in the RFD and held the job title Battalion Chief and Executive Deputy Fire Chief.

---

[2] Ms. Doe is a victim of domestic violence and has significant concerns for her physical safety, as such she declines to provide her exact address.
[3] https://www.cityofrochester.gov/rfd/. Last visited March 7, 2024.
[4] https://www.cityofrochester.gov/rfd/. Last visited March 7, 2024.

19. At all relevant times herein, Mr. Lawrence Brumfield was employed by defendant City of Rochester in the RFD and held the job titles Battalion Chief.

20. At all relevant times herein, Mr. Felipe Hernandez, Jr. was employed by defendant City of Rochester in the RFD and held the job title Executive Deputy Fire Chief and Fire Chief.

21. At all relevant times herein, Ms. Teresa Everett was employed by defendant City of Rochester in the RFD and held the job titles Executive Deputy Fire Chief and interim Fire Chief.

22. At all relevant times herein, Mr. Jeffrey Prince was employed by defendant City of Rochester in the RFD and held the job titles Captain and Deputy Fire Chief.

23. At all relevant times herein, Mr. Tramell Parson was employed by defendant City of Rochester in the RFD and held the job title Captain.

24. At all relevant times herein, Mr. Gary Lewis was employed by defendant City of Rochester in the RFD and held the job title Lieutenant.

25. At all relevant times herein, Mr. Jason Ashton was employed by defendant City of Rochester in the RFD and held the job title Lieutenant.

26. At all relevant times herein, Mr. Robert Robinson was employed by defendant City of Rochester in the RFD and held the job title Firefighter.

27. At all relevant times herein, Mr. Guy Higgins was employed by defendant City of Rochester in the RFD and held the job title Firefighter.

28. At all relevant times herein, Mr. Josh Reed was employed by defendant City of Rochester in the RFD and held the job titles Firefighter and Lieutenant.

29. At all relevant times herein, Mr. Roger Rebman was employed by defendant City of Rochester in the RFD and held the job title Lieutenant.

30. At all relevant times herein, Mr. Joseph Malik was employed by defendant City of Rochester in the RFD and held the job title Firefighter.

31. At all relevant times herein, Mr. Michael Rogers was employed by defendant City of Rochester in the RFD and held the job title Shop Mechanic.

32. At all relevant times herein, Mr. Dominick Aruck was employed by defendant City of Rochester in the RFD and held the job title Firefighter.

33. At all relevant times herein, individuals employed by defendant City of Rochester in the RFD with titles of Lieutenant, Battalion Chief, Captain, interim Fire Chief, Deputy Fire Chief, or Executive Deputy Fire Chief met the definition of "supervisor" under NYSHRL and NYLL.

34. At all relevant times herein, Ms. Linda Kingsley was employed by defendant City of Rochester in its department of law and held the job title Corporation Counsel.

35. Upon information and belief, at all relevant times herein Ms. Kingsley was a supervisor as defined by NYSHRL and NYSLL.

36. At all relevant times herein, Ms. Peachie Jones was employed by defendant City of Rochester in its department of law with the job title Municipal Attorney.

37. At all relevant times herein, Dr. Rose Nichols was employed by defendant City of Rochester in its Department of Human Resources with the job title Director.

38. Upon information and belief, at all relevant times herein Dr. Rose Nichols was a supervisor as defined by NYSHRL and NYSLL.

39. At all relevant times herein, Mr. Dan T. Butler was employed by defendant City of Rochester in the job title Chief Equity Officer.

40. At all relevant times herein, Mr. Fernan R. Cepero was employed by defendant City of Rochester in the job title Deputy Director, City of Rochester Department of Human Resource Management.

41. At all relevant times herein, Ms. Erica Torres was employed by defendant City of Rochester in the RFD in the job title Medical Case Manager.

42. At all relevant times herein, Mr. John Smith[5] was an individual employed by vendors working with RFD.

## JURISDICTION AND VENUE

43. This court has jurisdiction pursuant to 28 USC § 1331 and venue is proper pursuant to 28 USC § 1391 (b) (1) and (2).

44. Plaintiff respectfully requests this court exercise supplemental jurisdiction over her state law claims pursuant to 28 U.S.C. § 1367 (a) because these claims are so related to her § 1983 claims that they form part of the same case or controversy.

## FACTS COMMON TO ALL CAUSES OF ACTION

---

[5] Ms. Doe has filed this complaint with a request to pseudonym herself and her former domestic partner due to ongoing and serious threats to Ms. Doe's physical safety.

<u>New York's Commitment to the Prevention of Domestic Violence</u>

45. New York State has long recognized the importance of preventing domestic violence.

46. In 1987, New York State passed Social Service Law § 459-a declaring "The legislature hereby finds that the development and funding of programs providing emergency intervention, shelter, and assistance to victims of domestic violence is of major importance to this state."  Laws 1987, ch. 838, § 1, eff. Aug 7, 1987.

47. Shortly afterward New York State affirmatively recognized the role of employers in addressing domestic violence.

48. In 1992, the executive department passed a law creating the "Office for the Prevention of Domestic Violence (OPDV)."  *See* L 1992, ch 463, § 2, effective July 17, 1992.  In 1997 the law was amended to require the OPDV "convene a task force including members of the business community, employees, employee organizations, representatives from the department of labor and the empire state development corporation, and directors of domestic violence programs, including representatives of statewide advocacy organizations for the prevention of domestic violence, to develop a model domestic violence employee awareness and assistance policy for businesses."  Executive Law § 575 (Consol., Lexis Advance through 2024 released Chapters 1-23).

49. The OPDV formulated a model workplace policy for state agencies to address domestic violence (the "Model Domestic Violence and the Workplace Policy"), released in July 2000.

50. As reported by the Office of the Assistant Secretary for Administration & Management, violence is a leading cause of workplace injuries, according to the Department of Justice, including domestic violence incidents that spill into the workplace[6].

51. While coworkers and supervisors believe domestic violence should not, or does not, come into the workplace, it often does.  The same Department of Justice survey found "domestic violence accounted for 27% of violent events in the workplace[7]."

52. "It is not uncommon for the perpetrator to show up at the work site to carry out acts of violence against the partner or anyone trying to protect that person[8]."

53. Governor Eliot Spitzer's October 22, 2007 executive order mandated state agencies create a Domestic Violence and the Workplace Policy and conduct training on it.

54. In 2009, New York State Human Rights Law (NYSHRL) was amended to protect domestic violence victims from employment discrimination.

---

[6] [7] [8] https://www.dol.gov/agencies/oasam/centers-offices/human-resources-center/policies/workplace-violence-program#domesticviolence.  Last visited March 22, 2024.

55. In 2019, these protections under the NYSHRL were expanded to require employers to provide reasonable accommodations to domestic violence victims.

56. Despite more than thirty years of New York State's direction to employers regarding their obligations to prevent and respond to domestic violence, the RFD, the Union, and their employees and officers grossly failed to respond to Ms. Doe's obvious and documented needs as a victim of domestic violence.

RFD Culture

57. In or around 2023 the RFD conducted a survey and held focus groups for its employees to discuss the topic of diversity, equity, and inclusion in the workplace[9].

58. These focus groups were facilitated, and the resulting report were prepared, by Ms. Tammy Hodo, PhD, from All Things Diverse[10].

59. Relevant portions of this report are included in Exhibit A.

60. The report notes, "It is known throughout industry that firehouses can be a place of stress for those who don't resemble the majority, such as women […]".  Exhibit A, pg.14.

61. In describing how "Firefighter culture and workplace are different than the normal 9-5 job," Dr. Hodo highlighted firefighters "rely on one another to ensure safety and physical wellbeing" and "[t]rust and respect are highly regarded."  Exhibit A, pg. 2.

62. "In the fire service field, it is imperative that colleagues work well together as their lives literally depend upon one another."  Exhibit A, pg. 28.

63. Dr. Hodo also noted, "[l]iving together while on shift, eating meals together and sleeping in the same space creates a certain familial atmosphere."  Exhibit A, pg. 2.

64. Dr. Hodo further stated,

"[S]ince becoming a paid workforce [. . .] women and racial minorities [. . .] have been excluded from opportunities for employment.  Historically discriminatory hiring practices, nepotism and ideologies surrounding the social construct of race and gender kept minorities and women out of the fire service in large numbers."  Exhibit A, pg. 2.

65. The report also noted over 30% of respondents to the climate survey reported management was not committed to meeting the needs of employees with disabilities and

---

[9] Ms. Doe did not participate in this survey and notified supervisors and Dr. Nichols she would not complete this survey for fear of retaliation.  Ms. Doe informed Dr. Nichols Chief Hartman told Firefighters RFD leadership would know what they wrote in the survey.
[10] https://allthingsdiverse.com/diversity-services/.  Last visited March 13, 2024.

postulated some employees in the department could become disabled without disclosing their disability because they felt leadership would not support them.  *See* Exhibit A, pg. 10.

66. The survey results also demonstrated the "unsettling" finding that 33% of respondents disagreed or strongly disagreed that racial, ethnic and gender-based jokes are not tolerated with RFD.  *See* Exhibit A, pg.10.

67. The report comments "it is imperative for the organization set clear policies to address bullying, inappropriate comments/jokes and behaviors."  Exhibit A, pg. 10.

68. The report recalls a story shared in a focus group about a person in a position of power being so upset that a tampon machine had been installed in the bathroom of one of the firehouses that they pulled the machine off the wall and threw it to the ground - signaling that a product used by women on a normal basis and found in almost all women's restrooms was unwelcome.  *See* Exhibit A, pg. 15.

69. One observation in the report noted,

> "'RFD transfer policy is a joke, there is no equality in regard to transfers within the department'—we find this sentiment in several of the survey responses."  Exhibit A, pg. 21.

70. Another focus group participant commented,

> "It concerns me that COR allows men to belittle the female gender.  The usual reasons are outranking them in position.  You can file a complaint with HR and nothing comes of it."  Exhibit A, pg. 22.

71. Another comment noted,

> "[T]he Department only cares about one minority- African Americans.  While they have similar challenges, women are 'lower on the food chain' when it comes to addressing cultural and other underlying issues in the Department […] [women] are not listened to by administration about concerns."  Exhibit A, pg. 24.

72. Another comment was,

> "Why are all female offices on grps 1 and 3?  Why aren't there any females on truck companies?  […]  Injuries by women on the fireground and off are not taken seriously by chiefs.  Hard work by women in the FD is often overlooked and not appreciated."  Exhibit A, pg. 24.

73. Another statement suggested, "Designate separate locker rooms for male and female employees in all firehouses." Exhibit A, pg. 31.

74. Another commentor suggesting the following would make the work environment better:

> "Separate changing areas for women […] [e]nforcement of firehouses allowing tampon disposal receptacles to remain in place, [e]nforcement of gender neutral bathroom signs to remain in place, [d]oors on bathroom stalls, [p]rivate shower areas." Exhibit A, pg. 33.

75. According to the report, it seems women firefighters must change in closets while firefighters who are men have changing rooms; women are not provided with uniforms that fit then; pornographic materials are allowed in the workplace as is male firefighters' discussions of sexual escapades and there is no punishment for sexist comments. *See* Exhibit A, pg. 33.

76. Also in the report is mention of the Executive Deputy Chief of Operations (EDCO) being "chauvinistic and harassing." Exhibit A, pg. 32.

77. Defendant City has policies regarding Workplace Violence Prevention Program and Leave for Victims of Domestic Violence. These policies are included at Exhibit B.

78. Despite its adoption of these policies defendant City has engaged in a pattern and practice of ignoring domestic violence in the workplace.

<u>Ms. Doe</u>

79. Ms. Doe wanted to be a first responder most of her life.

80. She began her career serving as a volunteer firefighter for the Brockport Fire Department in 2013.

81. In 2014, Ms. Doe became EMT certified and immediately started working as an EMT for AMR in the City of Rochester, Penfield Ambulance as an EMT, and Union Hill Fire Department as EMT and part-time firefighter.

82. On January 3, 2017, Ms. Doe's dream to be employed as a firefighter was realized when she joined the RFD. She flourished in this role, participating in community outreach programs.

83. As soon as Ms. Doe was eligible, she joined the Union and started paying her dues.

84. Ms. Doe's experience with the RFD was not, however, all she dreamed of, beginning with her interview when she was asked how she would navigate being a firefighter given she would be "one of only a few" women.

85. At the time Ms. Doe was hired, she was one of less than 15 women firefighters in the RFD.

<u>Domestic Violence Victimization</u>

86. In 2019 Mr. Smith, who announced to multiple RFD members that he was getting divorced, began to romantically pursue Ms. Doe.

87. When Ms. Doe met Mr. Smith, he worked for Municipal Emergency Services Inc. (MES), a company that sells firefighting gear to firefighters, including those working for RFD[11].

88. Under the guise of needing to contact her to help fit her for her firefighting gear, Mr. Smith asked Ms. Doe to share her phone number with him and she did.

89. The two began dating shortly afterwards, in or around January 2020.

90. In April 2020, Ms. Doe and Mr. Smith moved into a home Ms. Doe secured.

91. Unfortunately, while Mr. Smith's behavior towards Ms. Doe was "perfect" in the beginning of the relationship, Mr. Smith became increasingly hostile towards Ms. Doe.

92. Eventually Mr. Smith became physically and emotionally abusive toward Ms. Doe, intimidating, manipulating, and threatening Ms. Doe and her property and causing her bruises, broken bones, and significant emotional distress.

93. Ms. Doe is a "victim of domestic violence" as that term is defined by the NYSHRL.

94. Ms. Doe experienced stomach ulcers due to the stress from the domestic violence she experienced.

95. Mr. Smith killed Ms. Doe's fish and threatened to kill her dog and horse.

96. Upon information and belief, Mr. Smith killed Ms. Doe's chickens after she disclosed to an RFD employee, Mr. Michael Rogers, about Mr. Smith hurting her.

97. Mr. Rogers witnessed the injuries Mr. Smith had given Ms. Doe, and told her, while she was at work, that he knew Mr. Smith had caused them.  Mr. Rogers insisted Ms. Doe tell him it was Mr. Smith.  Mr. Rogers would not leave Ms. Doe alone until she disclosed Mr. Smith's abuse.

98. While Ms. Doe asked Mr. Rogers not to speak with Mr. Smith's family about the abuse, Mr. Rogers did so anyway.  Upon information and belief, Mr. Smith killed Ms. Doe's chickens in retaliation for her disclosure.

---

[11] While Mr. Smith no longer works for MES, upon information and belief, the company Mr. Smith currently works for, Morning Pride, also serves RFD.

99. Mr. Smith regularly threatened and attempted to take his life and to kill Ms. Doe and her family members.

100.	Ms. Doe had to disarm Mr. Smith on multiple occasions when he attempted to kill himself and her.

101.	In addition to her physical injuries and emotional distress Ms. Doe suffered extreme anxiety because of Mr. Smith's abuse.

102.	Mr. Smith was unable to take care of his children himself and forced Ms. Doe to help him.

103.	Mr. Smith used the tactic of weaponizing his children against Ms. Doe, so she would stay with him and stay quiet.

104.	Mr. Smith prevented Ms. Doe from reporting for work through violence and threats, particularly when she was scheduled for a night shift, and caused Ms. Doe to miss a significant amount of work.

105.	Mr. Smith was friends with firefighters and well connected to RFD through his job, and often fished with Chief Luna, Lt. Andrew Dillon, and Lt. Lucas Falker.

106.	Mr. Smith also worked closely with Mr. Dominic Aruck, another RFD firefighter who Mr. Smith arranged to be hired by MES.

107.	Mr. Smith also worked with many RFD employees, such as Lt. Chris Batzel, Lt. Jim Church, Lt. Kevin Ryan, Executive Deputy Chief Rob Villa, Lt. Lewis, Todd Ricker, Captain Douglas Crowley, and Chief Timothy Young in their roles, as firefighters in RFD and other fire departments.

108.	Due to these, and other Mr. Smith had with Ms. Doe's coworkers, even at work, Ms. Doe was unable to escape him.

<u>2021</u>

109.	In example, on March 1, 2021, an intoxicated Mr. Smith appeared at Engine 8 where Ms. Doe was working.

110.	Prior to arriving, Mr. Smith repeatedly texted and called Ms. Doe, harassing her, and contacted one of Ms. Doe's RFD co-workers in an attempt to get Ms. Doe to talk to him during her night shift.

111.	Around 9:45AM Mr. Smith pounded on the door of Engine 8 and rang the doorbell.

112.	Two of Ms. Doe's coworkers let Mr. Smith inside.

10

113.    When Mr. Smith was let inside it was obvious he was intoxicated.

114.    Upon entering the firehouse, Mr. Smith yelled at Ms. Doe.

115.    Ms. Doe's nearby coworkers, including Mr. Chad Wyche and Lieutenant Gary Lewis, could hear Mr. Smith threatening Ms. Doe regarding the children.

116.    Mr. Smith threatened to kill himself if Ms. Doe did not leave work, declaring, "I will be dead before you can get to me." Mr. Smith then sped off in his car.

117.    Ms. Doe, worried Mr. Smith would follow through on his threat to kill himself, told her colleagues she needed to leave for an emergency and did leave around 10:00AM.

118.    Because Ms. Doe needed to leave her workplace Engine 8 no longer had the requisite number of firefighters to operate and another RFD engine 13 had to be called to be in service and report to Engine 8's quarters.

119.    When Engine 8 was called out of service, an announcement was made over the public radio system, so all RFD firefighters were aware of the disruption.

120.    Ms. Doe heard this announcement and cried knowing this would result in her colleagues speculating about why the engine was called out and likely lead to rumors in the RFD about what happened.

121.    Upon information and belief, no report was ever filed about this violent incident in the firehouse, despite the RFD and defendant City's Workplace Violence Policy requiring it. A copy of this policy is included at Exhibit B.

122.    When Ms. Doe arrived at the home she shared with Mr. Smith, he severely beat her.

123.    After this incident, a rumor spread around RFD that Ms. Doe abandoned her post and was "crying, leaving, and screwing over her relief."

124.    Other firefighters were critical of Ms. Doe for crying and leaving work.

125.    Ms. Doe returned to work the following shift, March 4, 2021, with obvious bruises on her body.

126.    Coworkers openly questioned Ms. Doe if Mr. Smith was the one who caused the bruises.

127.    A month later, on April 6, 2021, Mr. Smith beat up Ms. Doe when she returned home after a shift.

128.     When she returned to work on her next shift on April 9, 2021, Ms. Doe's coworkers inquired about her bruises and asked whether Mr. Smith had caused them.

129.     Ms. Doe confided in Lt. Terry Stott that Mr. Smith physically abused her. Lt. Stott said Mr. Smith was a coward for taking out his anger and stress on Ms. Doe and the children and advised Ms. Doe to go to Bivona Child Advocacy Center (Bivona) for assistance.

130.     Ms. Doe also confided this domestic violence relationship to Firefighters Ms. Annaliese Saranaki and Mr. Robert Mooney.

131.     Not coincidentally, also in Spring 2021, Ms. Doe began experiencing sex and gender harassment from Firefighter Robert Robinson, another firefighter employed by RFD.

132.     Mr. Robinson regularly and repeatedly talked negatively about Ms. Doe and other women, making it clear he believed women were less capable than men in every way, including as firefighters.

133.     Mr. Robinson's harassment echoed what other RFD employees reported in the DEI Report.  Dr. Hodo shared a summation of feedback,

> "[']As a woman [the RFD] is not very welcoming.'  Women must prove themselves more, lots of microaggressions, which are those everyday slights those in marginalized communities experience such as telling a woman 'She's pretty strong for a girl[']."  *See* Exhibit A, pg. 38.

134.     Upon information and belief, Mr. Robinson's harassing and degrading comments escalated to physical harassment of Ms. Doe when he put a fork in her uniform boot in an effort to inflict injury when she was quickly dressing in her gear[12].

135.     On June 17, 2021, Mr. Robinson requested a company meeting to mediate his conflict with Ms. Doe.  Ms. Doe confronted Mr. Robinson for putting a fork in her boot and about his harassing and belittling conduct. A loud argument ensued.

136.     Other firefighters present for this argument advised Ms. Doe things would end badly for her if she reported Mr. Robinson for his behaviors.

137.     Lt. Lewis observed the argument and called Captain Tramell Parson in from home to write an IDC about Mr. Robinson's behaviors towards Ms. Doe.

138.     On or around June 20, 2021, Battalion Chief Robert Shaw interviewed Ms. Doe about this report with Lt. Lewis present.

---

[12] Sadly, Mr. Robinson's behaviors were not uncommon amongst RFD employees.  One woman reported someone urinating in her locker in the DEI report.  *See* Exhibit A, pg. 38.

139.     During this meeting, Ms. Doe reported Mr. Robinson repeatedly subjected her to demeaning and harassing behaviors because she was a woman.

140.     Ms. Doe reported she had repeatedly tried to get Mr. Robinson to stop harassing her and was unsure how to get Mr. Robinson to stop without "putting it on paper" or making a formal report.

141.     Chief Shaw stated,

> "If you put something on paper, it's going right up to the top.  It's going past me.  It's going past the deputy.  I don't know much about car one or car two or exactly where it's going to wind up or end up.  But it's not stopping here. *Then we're going to get in trouble for that*, so that's the way it's going to go."  (Emphasis added).

142.     Ms. Doe believed Chief Shaw was trying to help her in this conversation by telling her, based on RFD culture, she would suffer socially and in her in career if a report went "on paper".

143.     After consultation with Chief Shaw and Lt. Lewis, Ms. Doe agreed not to file an official report against Mr. Robinson provided he was kept away from her.

144.     After Ms. Doe stated she did not want to "put it on paper," Chief Shaw promised that she would not need to work with Mr. Robinson again, Ms. Doe and Mr. Robinson would each be "floated[13]" out of Engine 8 to avoid ever working together.

145.     On July 26, 2021, Mr. Smith assaulted Ms. Doe at their home resulting in injuries to Ms. Doe's knee, and broken bones in her foot and hip.

146.     Ms. Doe was out of work for several months while her foot healed enough from the assault for her to return to work.

147.     Ms. Doe was able to arrange for knee surgery to occur in November 2021.

148.     Ms. Doe's surgeon estimated Ms. Doe could begin light duty work within 5-7 days of the surgery and her total recovery would be complete in three months.

149.     On October 30, 2021, Ms. Doe requested to be permitted to get her surgery and return to work in a light duty assignment.

150.     On November 1, 2021, Ms. Doe was told RFD would not pre-approve light duty to allow her to get surgery for her knee injury.

---

[13] Firefighters are "floated" essentially as a "try out" for a position with a different crew, providing opportunities for career advancement.

151.     On November 2, 2021, Chief Shaw showed Ms. Doe a printout of Chief Hernandez, Jr.'s response to her IDC, refusing to grant her light duty.

152.     It is unclear why Ms. Doe was denied light duty because several male firefighters who had off duty injuries were permitted to return to work on light duty.

153.     Ms. Doe made an agreement with Chief Shaw and RFD leadership to keep Ms. Doe at Engine 8 and float Mr. Robinson away during this time between her return from her broken foot and her needing to take time off to get surgery for her knee injury.

154.     Because of her knee injury, Chief Shaw consistently scheduled Ms. Doe at Engine 8 where she could serve as a driver to allow her to continue to work until she could get the needed knee surgery[14].

155.     On or about November 22, 2021, Battalion Chief Patrick Agostinelli assigned Ms. Doe and Mr. Robinson together.  Ms. Doe spoke to Lt. Lewis to object to this assignment given her understanding she would not need to work with Mr. Robinson due to his prior harassment towards her.

156.     In response to Ms. Doe's complaint, Lt. Lewis called Chief Agostinelli, noted Ms. Doe and Mr. Robinson should not be scheduled together and requested Mr.  Robinson be floated away from Engine 8.

157.     Lt. Lewis informed Battalion Chief Agostinelli that Chief Shaw and Command were allowing Ms. Doe to drive due to her knee injury.

158.     Instead of changing Mr. Robinson's schedule, Chief Agostinelli floated Ms. Doe immediately and intermittently away from Engine 8 until her surgery in January.

159.     Chief Agostinelli specifically transferred Ms. Doe to a more physically difficult role for the shift, one in which she would not be allowed to drive.

160.     Around 7:30PM on November 23, 2021, the day after Lt. Lewis called Chief Agostinelli to request a change to the schedule to accommodate Ms. Doe, Ms. Doe was told she needed to participate in a Functional Capacity Evaluation (FCE).

161.     While Ms. Doe was told she needed to demonstrate she could perform all duties required for work, however, she was not given any explanation why she was required to participate in an FCE *at this time*.

162.     The RFD asked her to complete an FCE when it knew she needed surgery since October 30, 2021, and it had denied her the ability to obtain this surgery by refusing her light duty upon her return, even though it was common procedure to provide accommodations for firefighters in these situations.

---

[14] It is common practice to schedule injured or older firefighters as drivers to allow them to continue to serve while they cannot fully perform the physical requirements of the job.

163.     Firefighters who fail to pass an FCE are taken off duty.

164.     On November 23, 2021, Ms. Doe complained to Mr. Santiago stating:

"So do I really have to do this fit for duty test tomorrow or are they making me do something you're not aware of?"

165.     Additionally, because Ms. Doe was out of sick leave at the time she was made to complete the FCE, the consequence for her failing the FCE would be termination of her position.

166.     Ms. Doe passed the FCE.

<u>2022</u>

167.     On January 19, 2022, Ms. Doe had surgery on her injured knee.

168.     Shortly thereafter, while at a retirement party, Ms. Doe spoke with Chief Joseph Luna, disclosing that the source of her knee, foot, and hip injuries and the reason for her absences was because of Mr. Smith's domestic violence.

169.     Chief Luna suggested Ms. Doe let information about her experiences of domestic violence "leak," to others in the RFD rather than Ms. Doe telling people what happened herself.

170.     Chief Luna described that the RFD's regular "gossip" would spread news of her experience in a way that could lead her co-workers to be less doubtful of her experience, specifically saying "let the gossip of the RFD save you for once."

171.     Chief Luna explained that not telling people of her experience of domestic violence directly and instead letting other people share her "story" would make her appear to be taking "the high road."

172.     Chief Luna further warned Ms. Doe "the story" had to be "told tactfully" and that if Ms. Doe tried to explain it herself, she would look dramatic.

173.     Chief Luna also told Ms. Doe if she wanted to appear as a "legitimate victim," she should not be "aggressive" about telling her perspective.

174.     On January 24, 2022, Ms. Doe met with Mr. Santiago, Mr. John Joseph, Union Secretary, and Mr. Matt Murphy, Union Vice President, and shared she was the victim of domestic violence and that it had even occurred at a firehouse while she was working.

175.     During this conversation, and later that day, Ms. Doe asked the Union for help in ensuring she could work while recovering from her injuries, even if she wasn't given a light duty assignment.

176.     Because male firefighters are often cleared for "full duty" despite not being physically able to do the work required while on full duty and are given "friendly" (the comparator of light duty) work while they recover, Ms. Doe wanted to be treated the same way.

177.     Ms. Doe also asked the Union to help ensure Mr. Smith was prohibited from being on RFD property.

178.     The Union said they could not help her at all with her needs related to the domestic violence she experienced, that she should report Mr. Smith to the police.

179.     On March 26, 2022, Ms. Doe texted Chief Luna explaining she needed a new light duty assignment to remain safe and return to work.

180.     This request to Chief Luna was for an accommodation due to her experience of domestic violence.

181.     Chief Luna told Ms. Doe she was unlikely to get a light duty assignment and that "light duty is on duty i[n]jury".

182.     Around this time, Ms. Doe asked Chief Luna if the RFD could prevent Mr. Smith from coming to RFD property.  He replied the RFD could not remove Mr. Smith from RFD property because RFD had a contract with MES.

183.     Ms. Doe clarified that RFD had a contract with MES, but not Mr. Smith specifically.  Ms. Doe explained MES could send another representative, and RFD should facilitate it since Mr. Smith had harmed an RFD employee and showed up intoxicated to one of their firehouses.

184.     In April 2022, Mr. Smith's ex-wife told Ms. Doe Mr. Smith was no longer working at MES, but at another company, selling fire equipment.

185.     On April 26, 2022, Ms. Doe texted Chief Luna asking Mr. Smith's standing with his company and RFD.

186.     Chief Luna replied, "I've only heard rumors.  He is still around but works at Honeywell selling turnouts.  Only rumor.  Not for me to know."

187.     Ms. Doe responded it was for Chief Luna to know since her career and safety were at risk.

188.     Also in April and May 2022, Mr. Smith's ex-wife notified Ms. Doe that she would likely be subpoenaed to testify about Mr. Smith's abusive behavior in their custody trial.  This threat to subpoena Ms. Doe significantly increased the risk of danger

she was in from Mr. Smith, a fact Ms. Doe communicated to several RFD and the Union in an attempt to get help.

189.     On June 22, 2022, Ms. Doe spoke to Mr. Santiago regarding the physical danger she was in and threatened to go to the mayor to discuss it.

190.     When Ms. Doe mentioned speaking to the mayor, Mr. Santiago asked her to wait to see if he could speak with "higher ups" to possibly do "something" for her safety.

191.     At one point in her conversation with Mr. Santiago Ms. Doe said, "You guys really hate me that much that when it comes to me being possibly murdered, when you know that he already broke my leg, you're really going to stand by him?"

192.     On June 28, 2022, Mr. Smith emailed Ms. Doe claiming he removed himself from his RFD account.

193.     Upon information and belief, Mr. Smith did so in an attempt to keep Ms. Doe from pressing criminal charges against him.

194.     Ms. Doe was not sure whether Mr. Smith actually did remove himself from the account and/or whether he would be permitted to be on RFD property.

195.     On July 1, 2022, Ms. Doe wrote an IDC to Chief Luna, making specific requests for accommodations for her safety upon her return to work, including requests that:

   a. Since Mr. Smith had committed domestic violence at Engine 33 (formally Engine 8 and where Mr. Smith appeared as fully described above), she be transferred out of that firehouse and group; and
   b. As Mr. Smith had access to her schedule, her coworkers be instructed no to share her personal information moving forward, including her schedule.

196.     That same day, Ms. Doe learned from another firefighter that her coworkers were making fun of her requests for accommodations, stating Ms. Doe's problems were "self-induced" and commenting that "if the situation [was] that bad that it [was] affecting [her] career, it was time for her quit," and mocking Ms. Doe stating, "Hey my husband and me got divorced I need an immediate transfer."

197.     Ms. Doe was cleared to return to work from her knee surgery for July 6, 2022.

198.     On July 11, 2022, her first scheduled shift after being cleared to work, Ms. Doe was assigned back to her group (Group 4) and Engine 33 despite her request for an accommodation to move groups.

199.     Because Ms. Doe could not work at Engine 33, she worked Group 4 Engine 12 for her July 11, 2022 nightshift.

200.      On July 12, 2022, Ms. Doe wrote an IDC to Chief Luna complaining of the RFD's failure to accommodate her request for an accommodation and requesting a response to her July 1, 2022 IDC.

201.      Ms. Doe also texted Mr. Santiago to express her concern the RFD was not protecting her, or other firefighters, from the dangers Mr. Smith posed.  Ms. Doe specifically reported to the Union that her July 1, 2022 IDC requesting accommodation never received a response, she was not transferred, and no safety plans were made for her or her crew members.

202.      Rather than help, Mr. Santiago suggested Ms. Doe contact local law enforcement claiming there was not much the Union or RFD could do with a "domestic issue".

203.      That same day and in response to Ms. Doe's July 12, 2022 IDC, Deputy Chief Jeffrey Prince verbally informed Ms. Doe she would be assigned to another group and floating on that group, and she would not be placed at her assigned firehouse as an accommodation to protect her location.

204.      Unfortunately, this did not happen.

205.      On July 14, 2022, Mr. Santiago notified Ms. Doe she was transferred to Engine 33 on Group 1 for July 21, 2022, and not floated.

206.      Being transferred back to Engine 33 where Mr. Smith attacked Ms. Doe was not an accommodation.

207.      On July 19, 2022, Ms. Doe wrote an IDC to Chief Hernandez, Jr. noting this apparent scheduling error and requesting to be floated on that day.  Ms. Doe further requested a response to her IDCs from July 1, 2022 and July 12, 2022.

208.      Ms. Doe also wrote to Deputy Chief Prince asking for his assistance with this issue given his July 12, 2022 promise to her.

209.      Receiving no response from the Fire Chief's Office regarding her IDCs, on July 20, 2022, Ms. Doe sent an email to Lts. Roger Rebman and Jason Ashton (who would be supervising her on July 21, 2022), notifying them of the potential hazards associated with her assignment to Engine 33 and attaching the (unanswered) IDCs she submitted to RFD leadership.

210.      On July 23, 2022, still scared for herself and coworkers, Ms. Doe wrote an IDC to Chief Hernandez, Jr. asking for the RFD to communicate with her regarding Mr. Smith's status with the department and whether he could report to RFD locations.

211.      In this IDC Ms. Doe clearly stated she was experiencing workplace harassment and discrimination for being a victim of domestic violence.

212.      Also on July 23, 2022, Ms. Doe spoke with Executive Deputy Fire Chief James Hartman regarding safety accommodations including reporting to Engine 12 G1 for her safety.  Chief Hartman promised Ms. Doe:

    a.  She would always be assigned to Engine 12 (a location where Ms. Doe's car could be hidden from public view).

    b.  He would ensure everyone at Engine 12 knew Mr. Smith could not enter the building.

    c.  The entire RFD would be notified on July 25, 2022, that sharing employee information to non-employees is prohibited and a punishable offense.

    d.  He would investigate Engine 8 (now Engine 33) to determine whether anyone failed to report workplace violence and he would severely punish anyone who did.

213.      Around this time, one of Ms. Doe's supervisors took her aside and told her that although he knew her IDCs were credible, leadership felt she was writing too many, and if she wrote one more IDC, they would put her out of work as "mentally unfit for duty."

214.      Just two days later, on July 25, 2022, Ms. Doe was assigned to work at the same location Mr. Smith had been assigned to work in the past.  Ms. Doe called out of work sick to avoid any possible encounters with him for her safety as she did not want to be assaulted or followed home.

215.      At this time, Ms. Doe was constantly moving her residence to stay safe.

216.      On July 27, 2022, Ms. Doe emailed Chief Hartman summarizing and checking in on the status of the commitments he made to her during their July 23, 2022 conversation.

217.      Chief Hartman replied to Ms. Doe the same day, largely dismissing her concerns and disavowing his earlier promises.  He also attached the Domestic Violence Leave Policy and instructed her to contact Dr. Rose Nichols, Director, Department of Human Resources for defendant City, to discuss a leave.

218.      In his email Chief Hartman wrote, "This is not something many of us have dealt with so there will be mistakes made."

219.      At the time Chief Hartman bemoaned, "this is not something many of us have dealt with so there will be mistakes made," *25 years* had passed from the time New York State first recognized the need to protect victims of domestic violence in the workplace.

220.      The lethal danger of domestic violence requires "mistakes" not be made and that reasonable accommodations be provided.

221.      In Ms. Doe's case, the Union and defendant City did not merely make "mistakes;" they made series of decisions to protect an abuser and discriminate and endanger against a RFD firefighter.

222.     In his email, Chief Hartman further wrote, "I cannot make everyone understand what you are requesting because there are too many variables …"

223.     Chief Hartman also stated that despite Ms. Doe specifically indicating various places she felt unsafe due to the horrendous domestic violence she experienced (e.g., supply depot to be fitted for gear), she would still need to go to those places.

224.     It is unclear why the RFD refused to arrange for Ms. Doe to be fitted for and/or pick up her gear at a location other than the supply depot, particularly as the supply depot commonly made deliveries to firehouses.

225.     Finally, despite Chief Hartman telling Ms. Doe he would make sure everyone knew there would be consequences if they shared Ms. Doe's personal information, he now said, said "I am not ready (without just cause) to threaten the membership with possible punishment for doing something that they should already know is wrong."

226.     Ms. Doe was shocked at this response, particularly as she had reported Mr. Smith's stalking Ms. Doe at her workplace and telling Ms. Doe he knew where she was because he got her schedule.

227.     The response was particularly shocking given it was now also aware that Mr. Smith caused Ms. Doe serious physical injuries, killed her animals, and attempted to kill her with multiple weapons, including a gun.

228.     Following Chief Hartman's disappointing response, on July 29, 2022, Ms. Doe did what she understood her leadership did not ever want her to do, she made a formal complaint to defendant City.  She wrote to Dr. Nichols, informing her of a "domestic violence issue" and reporting she was "extremely fearful for the safety of myself and my coworkers."

229.     Ms. Doe explained to Dr. Nichols she had been attempting to create and implement a plan for her safety for months to no avail.

230.     Dr. Nichols never responded to this email.

<u>2023</u>

231.     In early 2023 Mr. Smith was required to participate in a child custody trial with his former spouse.

232.     Mr. Smith notified Ms. Doe she would be asked to testify in this trial as a witness (while his ex-wife had already threatened Ms. Doe with a subpoena) and requested that I tell him what I would testify about in the hearing.

233.     Because of the increased risk of danger this trial caused Ms. Doe and the significant stomach ulcers she developed in connection with this stress, she took sick leave from early January 2023 through March 3, 2023.

234.     Around this time, Ms. Doe heard from other firefighters that Mr. Santiago had been telling RFD members Ms. Doe was "lawyered up" and seeking to bring "a claim" against the RFD and should be careful about what they say to her.

235.     Also around this time, Ms. Doe learned RFD leaders asked firefighters Ms. Doe worked with to "document" their experiences with Ms. Doe.

236.     When Ms. Doe returned to work, Chief Hartman began appearing to supervise nearly every call Ms. Doe's company was called out to, including leaving a catastrophic five-alarm fire to appear at a simple, single-company dumpster fire occurring at the same time.

237.     Ms. Doe's crew commented that it was strange Chief Hartman was appearing so regularly.

238.     Upon information and belief, Chief Hartman was following Ms. Doe signaling to her and her crew signaling his presence would be known, and Ms. Doe told her crew exactly this.  Lt. Reed indicated to Ms. Doe that he knew this was true.

239.     In or around April 2023, Ms. Doe attempted to obtain new firefighter uniform pants and Captain Crowley, supply depot captain, refused.

240.     About a month after returning to work, on April 26, 2023, Battalion Chief Lawrence Brumfield told Ms. Doe in front of her male firefighter colleagues she should take the Lieutenant's exam.

241.     Chief Brumfield said Ms. Doe should want to take the Lieutenant's exam specifically because she is a woman and Ms. Doe replied she wanted to serve on truck actively firefighting.  Ms. Doe explained that doing so would help women in the department because, although there was one female in a supervisory position on a truck, there were no active women firefighters on trucks.

242.     Immediately afterwards it was clear Ms. Doe's male colleagues were upset Ms. Doe was being encouraged to get a promotion because she was a woman.

243.     Lt. Reed was particularly and visibly upset, began pacing the room and scoffed that no women want to work on truck.

244.     Although Ms. Doe had regularly experienced hostility when she mentioned wanting to work on a truck, she was surprised by the hostility with which Lt. Reed responded.

245.     Ms. Doe said when she was ready to work on a truck, she wanted to work at a firehouse that was safe where people would not sabotage her performance to portray women as incapable, including by endangering Ms. Doe, like for example throwing her down the stairs in a fire.

246.     Brumfield said *when* it happens to you, it will be handled, to which Ms. Doe responded, "I don't want it to ever happen to me, I shouldn't be subjected to violence at work."

247.     To this, one coworker, Mr. Joseph Malik, replied if Ms. Doe that if she did not want to be around violence she came to the wrong place.

248.     Ms. Doe asked Mr. Malik twice, in front of Chief Brumfield, Lt. Reed and Firefighter Hepburn whether he was truly stating if she did not want to be subjected to employee-on-employee violence, she came to the wrong place.  Chief Brumfield, Lt. Reed and Firefighter Hepburn changed the subject.

249.     About a week later, on May 7, 2023, Mr. Guy Higgins, asked Ms. Doe about the April 26, 2023 conversation because he heard there was "blowup" with the crew.

250.     While discussing the April conversation, the topic of domestic violence came up.

251.     Mr. Higgins trivialized of Ms. Doe's concerns about the history of violence between firefighters in the RFD, telling her that her personal experience of violence was warping her perspective about the potential for violence in the workplace.

252.     Ms. Doe told Mr. Higgins she was going to report his comments to her Chief and did text Lt. Josh Reed, who in turn made her write an IDC about all the crew members behaviors.

253.     In this IDC, Ms. Doe indicated her coworkers degraded her when he (unprompted) brought up the domestic violence he knew she was experiencing and used it against her when discussing safety on shift.

254.     In response to this IDC, Dr. Nichols called Ms. Doe at work and told Ms. Doe she needed to come into a meeting on May 17, 2023.

255.     During this call, Ms. Doe informed Dr. Nichols she was afraid of consequences for coming forward with any workplace complaint.

256.     Dr. Nichols promised Ms. Doe the meeting would be confidential and on May 17, 2023, Ms. Doe met for the first time with Dr. Nichols and Ms. Peachie Jones, Municipal Attorney for defendant City.

257.     Ms. Doe shared she was a victim of domestic violence and had been working with Willow Domestic Violence Center to try to keep herself safe from Mr. Smith as he had broken bones in her body and threatened to kill her.

258.     Ms. Doe expressed concern she would be retaliated against for speaking about her experience of domestic violence explaining Mr. Smith worked with, and was friends with, many RFD employees.

259.     Ms. Doe expressed concern Mr. Smith would learn her new address from his friends at the RFD as employee addresses are listed physically in firehouses, on RedAlert, and on company rosters in the G (shared) Drive.

260.     Ms. Doe also shared her concern that other firefighters would not trust her if she spoke out about Mr. Smith's domestic violence, which would put her in a dangerous position, given how important it is for firefighters to trust one another.

261.     Ms. Doe also reported she was being belittled because she was a victim of domestic violence.

262.     Ms. Doe expressed her fear she would be fired for a bogus reason if she spoke out about Mr. Smith's domestic violence.

263.     At this meeting, Dr. Nichols and Ms. Jones assured Ms. Doe she would not be fired.

264.     At the conclusion of this meeting it was determined that RFD would not schedule those employees who had harassed her with Ms. Doe.

265.     Mr. Smith still attended RFD-related work functions.

266.     In example, Mr. Smith attended "The 2023 RFD pike derby" fishing contest, also sponsored and attended by the Union.

267.     Both Mr. Smith's private company as well as the company he works for are currently newly added advertised sponsors for the 2024 upcoming event, despite Ms. Doe having notified the RFD Mr. Smith had been stalking her.

268.     The derby is described as an event for professional firefighters to pike fish, and the trophy is etched with the words "Rochester firefighters" and used the Union's logo.

269.     Ms. Doe asked the Union and defendant City for help enforcing Mr. Smith's ban but was told the events were not official RFD events, leaving them without authority over attendees.

270.     Since Mr. Smith was and is attending these RFD and Union events, Ms. Doe cannot.

271.     On June 21, 2023, Lt. Reed asked Ms. Doe when she was going out on leave for surgery.

272.     Ms. Doe told Lt. Reed that leaving for surgery was impossible unless specific accommodations for her safety were implemented and outlined those requests.

273.     The following day, Ms. Doe added she was going to call for a meeting with command staff and the Union in which she could them the videos and pictures and reports proving Mr. Smith assaulted her, in the hopes they would take it seriously and protect her.

274.     On June 29, 2023, Ms. Doe arrived at work her next work shift to find Firefighters Higgins and Malik were scheduled to work with her.

275.     Ms. Doe had not been scheduled to work with Firefighters Higgins and Malik since the confrontations in April and May, pursuant to the agreement with HR to not be scheduled with them.

276.     Based on instructions from Chief Hartman's July 27, 2022 email, Ms. Doe pulled Lt. Reed aside to express her discomfort working with Firefighters Higgins and Malik.

277.     After Ms. Doe complained to Lt. Reed, he called Chief Brumfield.  Instead of accommodating Ms. Doe by immediately mitigating the issue by floating Ms. Doe, Chief Brumfield stated he was he coming to the firehouse.

278.     At this time, Engine 12 was put out of service and this fact was broadcast over the radio.

279.     When Chief Brumfield arrived, Ms. Doe was outside the firehouse on the phone with Mr. Santiago.

280.     Chief Brumfield approached Ms. Doe and asked to speak with Mr. Santiago. Ms. Doe handed Chief Brumfield her phone.

281.     When Chief Brumfield handed Ms. Doe her phone back, Mr. Santiago confirmed she should have a representative present from the Union, but because of a graduation event Mr. Santiago was unavailable.

282.     Mr. Santiago did not send any Union representative for Ms. Doe.

283.     When Chief Brumfield and Ms. Doe returned inside the firehouse, he sent the rest of the crew across the street, so no witnesses were present for their conversation. Ms. Doe repeatedly asked for her Union representative.

284.     Chief Brumfield required Ms. Doe to write another IDC about Firefighters Higgins and Malik.

285.     The IDC was sent to Chief Hartman who told Chief Brumfield Ms. Doe was going home "sick".

286.     Ms. Doe objected to being forced to leave work, adamant she was not sick and wanted to continue working, even offering to go to another firehouse.

287.     Even though Ms. Doe asked to not be removed from work, Chief Brumfield explained the period of time Firefighters Higgins and Malik had "gone long enough."

288.     Shortly thereafter Deputy Chief Prince arrived and instructed Ms. Doe to leave.

289.     Upon information and belief, the fact of Chiefs Brumfield and Prince going to the firehouse was also broadcast over the radio and visible to all RFD members per Bryx911 and the computer.

290.     Ms. Doe inquired on as to the basis of her removal, and Deputy Chief Prince stated, "We will determine that later."

291.     Deputy Chief Prince also said she was being sent home "sick."  Ms. Doe replied with incredulity, "sick?!?" and noted she did not have a Union representative present.

292.     Rather than address the issue or attempt to accommodate her, Ms. Doe was removed by Chief Brumfield and Deputy Chief Prince from her employment, with Chief Prince ordering Ms. Doe out of the building.

293.     On June 29, 2023, Ms. Doe reported to the Union she was experiencing harassment and discrimination and had been unlawfully removed from her job.

294.     On June 30, 2023, Mr. Santiago notified Ms. Doe the transfer list came out and she was to be transferred to the Fire Chief's office.

295.     Ms. Doe was surprised she was now being told (for no apparent reason) to report to the Fire Chief's office when she had previously been denied for an administrative position to keep her safe.

296.     Individuals are not transferred to the Fire Chief's Office in such a manner unless something egregious has occurred.

297.     Ms. Doe warned Mr. Santiago that no safety protocols had been put in place to ensure Mr. Smith would not learn her schedule.

298.     Mr. Santiago replied, "That's why you have to get law enforcement involved. The department has to run the department."

299.    In or around July 2023, Ms. Doe made a complaint of harassment to Mr. Dan T. Butler, Chief Equity Officer, City of Rochester, and Mr. Fernan R. Cepero, Deputy Director, City of Rochester Department of Human Resource Management.

300.    On July 10, 2023, Mr. Cepero emailed Ms. Doe to acknowledge her complaint of a hostile work environment and confirmed Ms. Doe's email is considered a formal complaint.

301.    Ms. Doe believed defendant City would investigate her complaint of harassment based on the email exchange between Mr. Cepero and herself and a scheduled meeting from Mr. Cepero placed on her calendar entitled "Hostile Work Environment Investigation Interview."

302.    However, only a few days later, on July 14, 2023, Ms. Doe received a meeting cancellation notice.

303.    Along with her harassment complaint, Ms. Doe was hoping to speak with defendant City about another surgery she needed to repair her hip, also injured by Mr. Smith's July 26, 2021 attack.

304.    Recalling the difficulties she had surrounding leave for her knee surgery, Ms. Doe sought clarity from defendant City regarding how much time off she would have to recover and what steps would be put in place to ensure her safety while out on leave.

305.    On July 14, 2023, Mr. Cepero emailed,

"As Dan Butler, Chief Equity Officer, informed you on Friday, July 14, 2023[15] [sic], this matter is being handled only by Dr. Rose Nichols, Director DHRM and the City of Rochester Law Department.  Our meeting is therefore being canceled.  Dr. Nichols will reach out to you to schedule a meeting with her and representatives from our law department."

306.    Also on July 10, 2023, Ms. Doe met in person at City Hall for a second time with Ms. Linda Kingsley, Corporation Counsel, Ms. Jones and Dr. Nichols to discuss her safety and request for domestic leave time for her hip surgery including utilizing furloughs, cycles and light duty extension.

307.    During this conversation, Ms. Doe stated multiple times she was scared for her safety.

308.    She also told defendant City representatives other RFD members harassed her and Mr. Smith is friends with RFD members who protect him.

---

[15] This date does not make sense, but it is what was written in the email.

309.	Ms. Doe stated she had been harassed and retaliated against for her status as a domestic violence victim.

310.	Ms. Doe shared men are treated differently than women in similar roles within the RFD.

311.	During this meeting, Ms. Doe focused on scheduling her necessary surgery and desire for being kept safe during the process.  Ms. Doe gave the example of floating her assignments upon her return from surgery as a possible safe option.

312.	Ms. Doe also stated Mr. Santiago was not helping her, and that she had heard he had been arrested for domestic violence against a woman.  Those present acknowledged they knew about this incident and had read the "reports."

313.	On July 18, 2023, Ms. Doe texted Dr. Nichols she had not heard anything back from Dr. Nichols since their meeting eight days prior.  Ms. Doe had also emailed Dr. Nichols four days prior, on July 14, 2023, and had not received a reply.

314.	On July 20, 2023, Dr. Nichols emailed Ms. Doe, "We agree that if your surgery is scheduled in September you should have enough accrued leave through the end of 2023 to begin your recovery."

315.	Dr. Nichols also told Ms. Doe she can choose to continue working in the Fire Chief's office until her surgery, for her own safety, or be a floater, as Ms. Doe originally requested.

316.	Ms. Doe emailed back on July 23, 2023, clearly explaining concerns for her safety and assassination of her character to coworkers.

317.	On July 25, 2023, Ms. Doe emailed Dr. Nichols copying Ms. Jones and Ms. Kingsley.  In this email, Ms. Doe explained the reasons why she would not be able to share her exact surgery date with defendant City.

318.	Ms. Doe's email described how Mr. Smith could always find her because the firehouses share daily rosters including sick time, and when a firefighter is out of work for surgery the roster states the exact tome of "leave" a firefighter is on (e.g., sick, off-duty injured, on-duty injured, etc.) and he had access to the firehouses.

319.	Ms. Doe was rightly concerned for her safety.  Mr. Smith had previously emailed Ms. Doe, "I saw the line sheet, hope E-3 is being good to you today," a clear threat that he could access Ms. Doe.

320.	Another time Mr. Smith had emailed Ms. Doe,

"I hope the accident you guys just got called to isn't bad and you kicked ass. I've been following the incident page today to see what kind of calls you've been getting and hoping that you're doing okay."

321.      Because Mr. Smith remained friends with many RFD personnel and because the fact of her being on medical leave would be shared with all RFD personnel via the distribution of the roster sheets and computer, Ms. Doe feared sharing the exact date of her surgery with defendant City would result in Mr. Smith attacking her at a time she was most vulnerable.

322.      Ms. Doe notified these defendant City officials she had spoken with the State and Livingston County police (as RFD and the Union had encouraged her to do), and they told her while Mr. Smith was stalking her, they were optionless since RFD had failed to act in banning him.

323.      In this July 25, 2023 email, Ms. Doe also reminded Dr. Nichols, Ms. Jones, and Ms. Kingsley, she had informed them in person and in writing (text and email), that she was being actively harassed at work.

324.      Ms. Doe requested the opportunity to share more information about this harassment with Dr. Nichols, Ms. Jones, and Ms. Kingsley, however, due to HR's cancellations of appointments, she was unable to do so.

325.      Ms. Doe also reported her concern that Line Chiefs (and possibly others) were attempting to illegally terminate her for refusing to report for work, when camera footage proved she was present.

326.      When Ms. Doe notified Dr. Nichols, Ms. Jones, and Ms. Kingsley of her many concerns, they were not taken seriously. Instead, Dr. Nichols and Ms. Jones instructed her to attempt to always have witnesses around her.

327.      Ms. Doe ended her email stating this one person could take away her life and she has been asking defendant City for a year to help keep her safe.

328.      Ms. Doe explained in her July 25, 2023 email that she needed to take domestic violence leave to have meetings with law enforcement, to safety plan, meet with legal counsel and obtain counseling and medical treatment.

329.      Also in this July 25, 2023 email Ms. Doe noted she was placed in a new work location scanning 20 year old documents, in retaliation, when instead, she could have been accommodated and transferred to a safer location where a firefighter was needed, like in Fire Safety or Community Risk Reduction (CRR).

330.      Previously, in March 2022, Ms. Doe requested Chief Luna permit her to serve in the CRR role as a safety accommodation, even temporarily. She stated one of the current

people in that position asked her to replace him, and she was only one of a few firefighters to be certified for that role with her NYS Fire and Life Safety Educator.

331.     Chief Luna told Ms. Doe she could not go to CRR due to lack of budget for an extra CRR role.

332.     Upon information and belief, male firefighters have been placed in the CRR role as an accommodation for off duty injuries and medical issues even when the position is not vacant in order to allow them to maintain their career.

333.     On July 28, 2023, at 5:03PM, Dr. Nichols left a voicemail for Ms. Doe, questioning why she did not report to work on July 27, 2023, and July 28, 2023.

334.     Ms. Doe asked Dr. Nichols why she was being accused of not calling in and not showing up when she had emailed her supervisor and copied in Dr. Nichols the day before Ms. Doe took leave explaining her need for leave.

335.     Ms. Doe expressly stated she felt Dr. Nichols' outreach was retaliatory.  Ms. Doe felt as if she were being threatened with termination for not coming into work when she had in fact reported in advance that she would not be present.

336.     On August 3, 2023, Ms. Doe texted with Dr. Nichols asking for a time to meet as she was worried about her safety.  Ms. Doe again stated her safety was in danger since Mr. Smith had not been "red flagged" or banned by the RFD.

337.     Upon information and belief other individuals have been "red flagged" or banned by the RFD under circumstances posing much less danger to RFD staff than the potential danger Mr. Smith poses.

338.     On August 7, 2023, almost two weeks after Ms. Doe's July 25, 2023 email discussing fearing for her life, Dr. Nichols responded, stating Ms. Doe could now work from the Training & Safety Center, a different location from her previous assignment.

339.     Dr. Nichols once again asked for the date of Ms. Doe's surgery, despite Ms. Doe's repeated explanations for why she could not share the date and despite the practice of the RFD is to call off at least four hours before a shift, not weeks in advance.

340.     Instead of scheduling a meeting or helping Ms. Doe, as she had asked for numerous times, Dr. Nichols bribed Ms. Doe for information, holding a meeting about her safety over her head, stating,

> "Once the Law Department and DHRM have confirmation of your surgery, a date for a meeting to discuss the other issues you have been referencing in your email below will be scheduled."

341.     To be clear, Dr. Nichols refused to discuss Ms. Doe's safety concerns unless she shared information about Ms. Doe's upcoming surgery, when no other firefighter is required to share this type of information in advance.

342.     On August 8, 2023, Ms. Doe emailed Ms. Erica Torres, Medical Case Manager, RFD, as instructed.  Ms. Torres responded she would look into it that day, and never replied to Ms. Doe.

343.     Days later, Ms. Torres emailed Dr. Nichols with different information regarding her total sick leave hours.

344.     Afterwards, Mr. James Caswell gave Ms. Doe different information regarding her available sick leave.

345.     On August 9, 2023, Ms. Doe wrote to Dr. Nichols about thorough safety planning details for her to continue working and succeeding in her role, while protecting herself.

346.     Dr. Nichols replied the next day, August 10, 2023, saying she needed more time to respond.

347.     The next afternoon, on August 11, 2023, Ms. Doe emailed Dr. Nichols again specifically outlining why she had more safety concerns, including Mr. Smith's close friends and family recently contacting her, and pushed her return date to August 22, 2023, instead of Monday, August 14, 2023, to allow defendant City more time to respond to her with strategic safety plans.

348.     When Ms. Doe returned to work, she brought a note from her doctor regarding her need to take domestic violence leave for the entire duration of her leave period.  RFD was unsure to whom Ms. Doe should provide this note, but days later they asked her to give it to Ms. Nichols.  Ms. Doe did so, and it was accepted.

349.     On September 1, 2023, Ms. Doe emailed and texted with Dr. Nichols again, looking for answers regarding her hip surgery.

<u>Domestic Violence Leave</u>

350.     Unfortunately, the RFD jeopardized Ms. Doe's safety by arranging an event all her coworkers were advised, by both the Union and defendant City, to attend.

351.     This event was scheduled at the very building Ms. Doe had been assigned by Human Resources for the purpose of ensuring her whereabouts were unknown by coworkers.

352.     Ms. Doe contacted Ms. Kingsley again about her safety concerns and she responded, telling Ms. Doe to stop talking about domestic violence and tell defendant City the date of the surgery.

353.     Given Mr. Smith's strong connections to the RFD and because the RFD posts information regarding medical leave status for all RFD employees to view, Ms. Doe could not share the need for her leave with defendant City to protect her life.

354.     After continuous attempts to navigate her safety with the RFD for almost two years, Ms. Doe was tired and unable to keep trying to fight for her safety.

355.     On September 7, 2023, Ms. Doe requested her domestic violence leave begin September 8, 2023.

356.     Ms. Doe required a surgery to repair injuries caused by physical domestic violence scheduled for September 20, 2023.

357.     While Ms. Doe requested her domestic violence leave, she did not share further details.  Details defendant City seemed to demand.

358.     Consistent with the NYSHRL, Section 5.3 of defendant's City's Leave for Victims of Domestic Violence provides "…an employee must provide reasonable advance notice, *if possible*.  If such advance notice is not possible, within a reasonable amount of time after the absence an employee must provide certification or documentation…". (Emphasis added.

359.     Ms. Doe's understanding of her obligation, pursuant to the language of the policy, and consistent with the manner she had previously taken domestic violence leave is that she provide documentation related to her need for leave after her absence has concluded.

360.     Not only did Ms. Doe need to safety plan for her general protection, but Ms. Doe's surgeon also mandated she not be under any threat of violence and was not experiencing extreme stress at work or else he would refuse to operate.

361.     Given Ms. Doe's exhaustive attempts to resolve the safety issues she faced at work and the RFD's continued inability to make decisions demonstrating their understanding of the harm she faced, Ms. Doe could not disclose the date of her surgery as part of her safety planning.

362.     Ms. Doe did have surgery on her left hip on September 20, 2023, which was more intensive than anticipated.  Due to the domestic violence incident, her hip repair required not just a simple arthroscopy, but an arthroscopy with synovectomy, joint repair, trochanteric bursectomy and femoroplasty.

363.     Ms. Doe's surgeon estimated her recovery could be more than a year.

364.     In addition to the physical injuries Ms. Doe has been seeking treatment for, she has also been diagnosed with posttraumatic stress disorder and is currently under the care of the HEAL Collaborative at the University of Rochester.

365.     On October 23, 2023, RFD demanded documentation regarding Ms. Doe's absences.

366.     Ms. Doe provided a detailed account of the reasons for her absences on December 15, 2023.

367.     Defendant City did not respond to this December 15, 2023 correspondence.

2024<br>Defendant City's and the Union's Lack of Action

368.     Ms. Doe's paystub delivered on January 10, 2024 indicated her paycheck was $0, and she was on an "unauthorized absence."

369.     Ms. Doe has not been shown her final sick bank leave usage for 2023, despite requesting this information.

370.     That same day, Ms. Doe, through her attorney, notified defendant City via correspondence with Ms. Jones that Ms. Doe had not been paid and contributions to her Health Savings Account ("HSA") had not been made.

371.     Ms. Jones replied she would look into the issue.

372.     The following day, Ms. Jones emailed,

> "At some point in Dec 2023, FF [firefighter] Ms. Doe exhausted her paid leave accruals, so she was not paid after that point until Dec 31.  Her new allotment of sick leave is applied as of Jan 1, so she has access to that paid leave as of now."

373.     Ms. Jones did not explain why Ms. Doe's HSA was not funded.

374.     Ms. Doe contacted Lifetime Benefit Solutions (which oversees the HSA) and was told defendant City's Human Resources department is responsible for submitting the list of employees enrolled in the program each year and for the first time since her hire Ms. Doe was not on the list in 2024; and was therefore unenrolled from the HSA.

375.     On January 12, 2024, Ms. Doe received a Civil Service Section 75 hearing charge letter signed by RFD Fire Chief Stefano Napolitano alleging Ms. Doe was "unauthorized absences" and "failure to report sick leave."

376.     Civil Service Section 75 allows for an employee to be suspended with pay or suspended without pay but requires notice.  Ms. Doe's charge letter does not reference a suspension, with or without pay and yet defendant City had stopped paying her.

377.     On January 25, 2024, Ms. Doe, through her attorney, contacted the Union regarding defendant City's failure to pay her wages and requested the Union file a grievance on her behalf.

378.     The Union's attorney responded demanded Ms. Doe speak directly to the Union President, Ms. Doe then did send a message directly to Mr. Santiago.

379.     Following receipt of this charge letter, on February 2, 2024, Ms. Doe wrote directly to Mr. Santiago requesting a grievance be filed for the RFD's failure to pay her wages and that defendant City pay her in accordance with its 2020 MOU with the Union.

380.     In response, the Union's attorney (and not Mr. Santiago) responded with a confusing and inaccurate letter misstating the law.  The Union did not file a grievance on Ms. Doe's behalf, nor did they assist with reinstating her wages in a manner consistent with the Union contract.

381.     On January 31, 2024, Ms. Jones, for the first time explained,

> "As for her pay, FF Ms. Doe has paid leave accruals available to her.  Since we disagree on how to appropriately comply with the Domestic Violence Leave policy, I suggest she seeks to comply with City and RFD Sick Leave policies and procedures, in order to resume authorized leave status and receive a paycheck."

382.     Importantly, the sick leave policy is not appropriate for persons needing to take Domestic Violence Leave.  The RFD contract states: Section 3 - (Obligation of Employee on Sick Leave)
   1.   Unless authorized by the Fire Chief or his designee, an employee on sick leave will not leave his residence or authorized location during his normal tour of duty except for:
        a.   obtaining professional medical treatment, or
        b.   performing exercise prescribed in writing by his physician as part of his recovery treatment, a copy of which must be submitted to the Fire Chief or his designee prior to commencing such exercise.

383.     A copy of the sick leave policy is included at Exhibit C.

384.     On February 8, 2024, Ms. Doe, through her attorney, provided documentation from her physician regarding the need for her to remain out of work due to her injuries resulting from domestic violence through August 2024.

385.     Ms. Doe is still owed all her pay from January 1, 2024 forward, plus around $3,000 in parity pay, which should have been provided in February 2024.

386.     Despite Ms. Jones's assurance Ms. Doe had access to that paid leave as of now, and has not been terminated, she has not received another paycheck from defendant City.

387.    At the time of this filing, Ms. Doe's status is listed as "unauthorized absence" in RedAlert, in which all 500+ RFD employees have access.

## AS FOR A FIRST CAUSE

**Sex and Gender Discrimination
in Violation of the Equal Protection Clause
of the Fourteenth Amendment of the U.S. Constitution**

388.      Plaintiff repeats and restates the allegations contained in the prior paragraphs of this complaint as if set forth more fully herein.

389.      Ms. Doe is a female woman and defendant knows Ms. Doe is a female woman.

390.      Ms. Doe is an employee of RFD, an arm of the municipality defendant City of Rochester.

391.      The RFD discriminated against Ms. Doe on the basis of her sex and gender as more fully described above, including but not limited to when it,

   a. Failed to provide Ms. Doe (and other females/women) appropriate locker rooms and equipment, while male/men employees were provided appropriate lockers rooms and equipment.
   b. Permitted Ms. Doe (and other females/women) to be harassed, demeaned, and degraded because of her sex and/or gender.
   c. Refused to allow Ms. Doe a "light duty" assignment after she had surgery required due to Mr. Smith's physically abusing her, while allowing males/men with off duty injuries to return on light duty assignments as more fully described above.
   d. Denied Ms. Doe the opportunity to float to other fire houses to further her career because she is female/a woman while granting the same opportunity to males/men.
   e. Encouraged Ms. Doe to take a desk job instead of continuing to pursue her passion to be in a truck position because she is female/a woman.
   f. Placed male firefighters, and not Ms. Doe, in CRR roles as an accommodation even when the position(s) was not vacant.

392.      These actions by defendant City employees, at defendant City's workplaces, and while work was occurring, were actions by defendant City employees acting within the scope of their employment.

393.      Defendant City has engaged in a pattern of conduct demonstrating its deliberate indifference to the rights of female/women firefighters.

394.      The sex and gender discrimination Ms. Doe was subjected to was conducted by RFD under the color of state law.

395.      The sex and gender discrimination Ms. Doe was subjected to deprived Ms. Doe of the rights afforded to her under the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.

396.     Defendant City of Rochester acted with recklessness and/or serious indifference to or disregard for Ms. Doe's rights.

397.     As a direct and proximate result of defendant's actions and inactions, Ms. Doe has suffered monetary and non-monetary harms, damage to her reputation, personal humiliation, and mental anguish and suffering and will continue to suffer damages in an amount to be proven at trial.

398.     Plaintiff further seeks attorney's fees and costs and all other relief entitled to her under the law.

### AS FOR A SECOND CAUSE

**Retaliation for Complaining of Sex and Gender Discrimination
in Violation of the Equal Protection Clause
of the Fourteenth Amendment of the U.S. Constitution**

399.     Plaintiff repeats and restates the allegations contained in the prior paragraphs of this complaint as if set forth more fully herein.

400.     Ms. Doe is a female woman, and defendant knows Ms. Doe is a female woman.

401.     Ms. Doe is an employee of RFD, an arm of the municipality defendant City of Rochester.

402.     Ms. Doe was discriminated against on the basis of sex and gender as more fully described above.

403.     Ms. Doe reported the RFD's discrimination on the basis of sex and gender to defendant City as more fully described above.

404.     The RFD was aware Ms. Doe reported RFD's discrimination on the basis of sex and gender to defendant City of Rochester.

405.     The RFD retaliated against Ms. Doe because she reported discrimination on the basis of sex and gender, as more fully described above, including when:

    a. After Ms. Doe reported Mr. Robinson's sexist and harassing comments, Chief Agostinelli transferred Ms. Doe to a more physically difficult role for the shift, while she awaited knee surgery, as more fully described above.

    b. Immediately after Ms. Doe complained about Chief Agostinelli's retaliation against her to Lt. Lewis, Ms. Doe was required to take a Functional Capacity Evaluation (FCE), as more fully described above.

    c. After Ms. Doe complained of being on schedule with two firefighters the RFD had agreed not to scheduled her with because of their harassing behaviors towards her Ms. Doe was removed from work without access to Union representation (after she repeatedly requested it). Ms. Doe was told by RFD leadership

       i.   she needed to leave the premises

      ii.   she was going to be out "sick";

    iii.   she was required to report to the Fire Chief's Office upon her return;

    iv.   the harassers "had been gone long enough" from the firehouse, and

     v.   the reason for her removal would be determined later.

    d.  Mr. Santiago told RFD members Ms. Doe had "lawyered up" and sought to bring "a claim" against the RFD and should be careful about what they say to her.

406.      These actions by defendant City employees, at defendant City's workplaces, and while work was occurring, were actions by defendant City employees acting within the scope of their employment.

407.      The RFD's retaliation against Ms. Doe was conducted under the color of state law and deprived her of the rights afforded to her under the Equal Protection clause of the Fourteenth Amendment of the U.S. Constitution.

408.      Defendant City of Rochester acted with recklessness and/or serious indifference to or disregard for Ms. Doe's Constitutional rights.

409.      As a direct and proximate result of defendant's actions and inactions, Ms. Doe has suffered other monetary and non-monetary harms, damage to her reputation, personal humiliation, and mental anguish and suffering and will continue to suffer damages in an amount to be proven at trial.

410.      Plaintiff further seeks attorney's fees and costs and all other relief entitled to her under the law.

## AS FOR A THIRD CAUSE

### Sex/Gender Discrimination
### in Violation of New York State Human Rights Law

411.      Plaintiff repeats and restates the allegations contained in the prior paragraphs of this complaint as if set forth more fully herein.

412.      Ms. Doe is a female/woman, and defendant knows Ms. Doe is a female/woman.

413.      Defendant City is Ms. Doe's employer as defined by NYSHRL and Ms. Doe is defendant City's employee as defined by NYSHRL.

414.      The RFD discriminated against Ms. Doe on the basis of her sex and gender as more fully described above, including but not limited to when it,

    a.  Failed to provide Ms. Doe (and other females/women) appropriate locker rooms and equipment, while male/men employees were provided appropriate lockers rooms and equipment.

    b.  Permitted Ms. Doe (and other females/women) to be harassed, demeaned, and degraded because of her sex and/or gender.

    c. Refused to allow Ms. Doe a "light duty" assignment after she had surgery required due to Mr. Smith's physically abusing her, while allowing males/men with off duty injuries to return on light duty assignments as more fully described above.

    d. Denied Ms. Doe the opportunity to float to other fire houses to further her career because she is female/a woman while granting the same opportunity to males/men.

    e. Encouraged Ms. Doe to take a desk job instead of continuing to pursue her passion to be in a truck position because she is female/a woman.

    f. Placed male firefighters, and not Ms. Doe, in CRR roles as an accommodation even when the position(s) was not vacant.

415.    The sex discrimination Ms. Doe faced significantly and negatively altered the terms and conditions of her employment with RFD.

416.    As a direct and proximate result of defendant's actions and inactions, plaintiff has suffered out-of-pocket losses and other monetary and non-monetary harms, damage to her reputation, personal humiliation, and mental anguish and suffering and will continue to suffer damages in an amount to be proven at trial.

417.    Plaintiff further seeks attorney's fees and costs and all other relief entitled to her under the law.

### AS FOR A FOURTH CAUSE
### Retaliation for Complaining of Sex/Gender Discrimination
### in Violation of New York State Human Rights Law

418.    Plaintiff repeats and restates the allegations contained in the prior paragraphs of this complaint as if set forth more fully herein.

419.    Defendant City is Ms. Doe's employer as defined by NYSHRL and Ms. Doe is defendant City's employee as defined by NYSHRL.

420.    Defendant City discriminated against Ms. Doe on the basis of her sex/gender as more fully described above.

421.    Ms. Doe reported RFD's discrimination on the basis of sex/gender as more fully described above.

422.    Defendant City was aware Ms. Doe reported RFD's discrimination on the basis of sex as more fully described above.

423.    After Ms. Doe reported RFD's discrimination, the terms and conditions of Ms. Doe's employment with RFD was substantially and negatively impacted.

424.    The RFD retaliated against Ms. Doe because she reported discrimination on the basis of sex and gender, as more fully described above, including when:

  a.  After Ms. Doe reported Mr. Robinson's sexist and harassing comments, Chief Agostinelli transferred Ms. Doe to a more physically difficult role for the shift, while she awaited knee surgery, as more fully described above.

  b.  Immediately after Ms. Doe complained about Chief Agostinelli's retaliation against her to Lt. Lewis, Ms. Doe was required to take a Functional Capacity Evaluation (FCE), as more fully described above.

  c.  After Ms. Doe complained of being on schedule with two firefighters the RFD had agreed not to scheduled her with because of their harassing behaviors towards her Ms. Doe was removed from work without access to Union representation (after she repeatedly requested it). Ms. Doe was told by RFD leadership
      i.   she needed to leave the premises
      ii.  she was going to be out "sick"
      iii. she was required to report to the Fire Chief's Office upon her return
      iv.  the harassers "had been gone long enough" from the firehouse, and
      v.   the reason for her removal would be determined later.

  d.  Mr. Santiago told RFD members Ms. Doe had "lawyered up" and sought to bring "a claim" against the RFD and should be careful about what they say to her.

425.    Defendant City of Rochester acted with recklessness and/or serious indifference to or disregard for Ms. Doe's rights pursuant to New York State Human Rights Law.

426.    As a direct and proximate result of defendant's actions and inactions, plaintiff has suffered out-of-pocket losses and other monetary and non-monetary harms, damage to her reputation, personal humiliation, and mental anguish and suffering and will continue to suffer damages in an amount to be proven at trial.

427.    Plaintiff further seeks attorney's fees and costs and all other relief entitled to her under the law.

## AS FOR A FIFTH CAUSE

### Domestic Violence Harassment
### in Violation of New York State Human Rights Law

428.    Plaintiff repeats and restates the allegations contained in the prior paragraphs of this complaint as if set forth more fully herein.

429.    Defendant City is Ms. Doe's employer as defined by NYSHRL and Ms. Doe is defendant City's employee as defined by NYSHRL.

430.    Defendant knows Ms. Doe is a victim of domestic violence.

431.    Defendant City subjected Ms. Doe to harassment because she was a victim of domestic violence as more fully described above, including but not limited to when;

    a. Mr. Rogers forced her to disclose her experiences of domestic violence at work.

    b. Mr. Higgins trivialized of Ms. Doe's concerns about the history of violence between firefighters in the RFD, telling her that her personal experience of violence was warping her perspective about the potential for violence in the workplace.

    c. RFD leaders permitted negative rumors to persist regarding Ms. Doe's ability as a firefighter, in relation to the domestic violence victimization she experienced.

    d. RFD leaders permitted its members to violate the Workplace Violence Policy by not reporting Mr. Smith's encounter at Engine 8/33.

    e. Chief Luna suggested the RFD's regular "gossip" spread news of her experience in a way that could lead her co-workers to be less doubtful of her experience.

    f. Chief Luna explained letting other people share Ms. Doe's "story" would make her appear to be taking "the high road."

    g. Chief Luna further warned Ms. Doe "the story" had to be "told tactfully" and that if Ms. Doe tried to explain it herself, she would look dramatic.

    h. Chief Luna told Ms. Doe if she wanted to appear as a "legitimate victim," she should not be "aggressive" about telling her perspective.

    i. Ms. Kingsley told Ms. Doe to stop talking to people at work about her experience of domestic violence.

432. The terms and conditions of Ms. Doe's employment were altered by this harassment as more fully described above.

433. Defendant City acted with recklessness and/or serious indifference to or disregard for Ms. Doe's rights pursuant to New York State Human Rights Law as more fully described above.

434. As a direct and proximate result of defendant's actions and inactions, plaintiff has suffered out-of-pocket losses and other monetary and non-monetary harms, damage to her reputation, personal humiliation, and mental anguish and suffering and will continue to suffer damages in an amount to be proven at trial.

435. Plaintiff further seeks attorney's fees and costs and all other relief entitled to her under the law.

## AS FOR A SIXTH CAUSE

### Retaliation
### in Violation of New York State Human Rights Law

436. Plaintiff repeats and restates the allegations contained in the prior paragraphs of this complaint as if set forth more fully herein.

437. Defendant City is Ms. Doe's employer as defined by NYSHRL and Ms. Doe is defendant City's employee as defined by NYSHRL.

438. Ms. Doe was subjected to harassment in her workplace because she is a victim of domestic violence as more fully described above.

439.     Ms. Doe reported the harassment she faced because she is a victim of domestic violence to her employer, defendant City.

440.     RFD and defendant City knew Ms. Doe reported harassment because she is a victim of domestic violence as more fully described above.

441.     After Ms. Doe reported harassment because she was a victim of domestic violence the terms and conditions of her employment were substantially and negatively altered, as more fully described above, when:
   a. RDF permitted retaliatory harassment including, but not limited to,
      i. Permitting negative rumors to persist regarding Ms. Doe's ability as a firefighter, in relation to the domestic violence victimization she experienced.
      ii. Mr. Santiago telling RFD members Ms. Doe had "lawyered up" and sought to bring "a claim" against the RFD and should be careful about what they say to her.
      iii. RFD leaders asked Ms. Doe's firefighter colleagues to "document" their experiences with Ms. Doe.
      iv. Chief Hartman appeared to supervise nearly every call Ms. Doe's company was called out to.
      v. Telling Ms. Doe RFD leadership felt she was writing too many IDCs about workplace violence, and if she wrote one more, they would put her out of work as "mentally unfit for duty."
      vi. Dr. Nichols questioning why she did not report to work after Ms. Doe had already emailed Dr. Nichols explaining she needed to take domestic violence leave to have meetings with law enforcement, to safety plan, meet with legal counsel and obtain counseling and medical treatment.
      vii. Dr. Nichols repeatedly asked for the date of Ms. Doe's surgery despite (1) Ms. Doe's repeated explanations for why she could not share the date and (2) the practice of the RFD to call off four hours before a shift, not weeks in advance.
      viii. Ms. Kingsley emailed Ms. Doe on September 7, 2023 and instructed Ms. Doe to stop talking about domestic violence and tell defendant City the date of her surgery.
      ix. Captain Crowley refused to allow Ms. Doe to obtain new firefighter uniform pants.
   b. Refused to discuss Ms. Doe's safety concerns unless she shared information about her upcoming surgery with Dr. Nichols when no other firefighter is required to share this type of information in advance.
   c. Stopped paying Ms. Doe on January 10, 2024, and claiming she was on an "unauthorized absence."
   d. Did not include her on the list of RFD employees to Lifetime Benefit Solutions (which oversees Ms. Doe's HSA) for the first time since her hire and was therefore unenrolled.

e.  Sent a Civil Service Section 75 hearing charge letter signed by RFD Fire Chief Napolitano alleging Ms. Doe was responsible for "unauthorized absences" and "failure to report sick leave."

442.     As a direct and proximate result of defendant's actions and inactions, plaintiff has suffered monetary and non-monetary harms, including but not limited to, damage to her reputation, personal humiliation, and mental anguish and suffering and will continue to suffer damages in an amount to be proven at trial.

443.     Defendant acted with recklessness and/or serious and deliberate indifference to or disregard for Ms. Doe's rights pursuant to NYSHRL and therefore Ms. Doe also seeks punitive damages.

444.     Plaintiff further seeks attorney's fees and costs and all other relief entitled to her under the law.

### AS FOR A SEVENTH CAUSE

**Failure to Accommodate**
**in Violation of New York State Human Rights Law**

445.     Plaintiff repeats and restates the allegations contained in the prior paragraphs of this complaint as if set forth more fully herein.

446.     Defendant City is Ms. Doe's employer as defined by NYSHRL and Ms. Doe is defendant City's employee as defined by NYSHRL.

447.     The NYSHRL requires an employer to provide a reasonable accommodation to an employee who is a victim of domestic violence when the employee must be absent from work for a reasonable time in connection with their status, unless that absence would cause an undue hardship to the employer.

448.     Pursuant to the NYSHRL, a reasonable accommodation includes time off to:
   i.   Seek medical attention for injuries caused by domestic violence;
   ii.  Obtain services from a domestic violence shelter, program, or rape crisis center as a result of the domestic violence;
   iii. Obtain psychological counseling related to an incident or incidents of domestic violence;
   iv.  Participate in safety planning and taking other actions to increase safety from future incidents of domestic violence, including temporary or permanent relocation; –or–
   v.   Obtain legal services, assisting in the prosecution of the offense, or appearing in court in related to the incident or incidents of domestic violence.
   *See* N.Y. Exec. Law § 296(22)(c)(2).

449.     Ms. Doe needed to be absent from work in connection with her status as a victim of domestic violence when she:

     i.    Sought medical attention for her knee and hip injuries caused by Mr. Smith, as more fully described above.

    ii.    Engaged in safety planning prior to having surgery to ensure she would be safe from Mr. Smith's abuse while recovering from her hip surgery, as more fully described above.

450.     NYSHRL provides "The employer may require the employee to charge any time off against any leave with pay ordinarily granted.  If the absence cannot be charged, it may be treated as leave without pay."  *See* N.Y. Exec. Law § 296(22)(c)(1).

451.     Ms. Doe required time off to obtain her hip surgery due to Mr. Smith's domestic violence towards her and sought to charge the time off against her existing paid sick leave, as more fully described above.

452.     An employee who must be absent from work due to their status as a victim of domestic violence should provide their employer with reasonable advance notice of their absence unless such notice is not feasible.  *If advance notice is not feasible, within a reasonable time after the absence, the employee must provide a certification to the employer if one is requested* (emphasis added).  *See* N.Y. Exec. Law § 296(22)(c)(4).

453.     Because Ms. Doe could not safely provide advance notice of the date of the surgery Ms. Doe sought to provide such notice after her absence.

454.     Instead of permitting Ms. Doe leave, defendant City has classified her as taking an "unauthorized absence" and is currently seeking disciplinary action against her, as more fully described above.

455.     Instead of allowing Ms. Doe to charge her leave against her paid sick leave time, defendant City removed Ms. Doe's pay and benefits.

456.     Defendant City also failed to accommodate Ms. Doe when it:
     i.    Transferred Ms. Doe back to Engine 8/33 where Mr. Smith attacked her, instead of providing other, reasonable accommodations.
    ii.    Assigned Ms. Doe to work at the same location Mr. Smith had been assigned to work after stating she would not be scheduled there.
    iii.    Scheduled an event in the very building Ms. Doe had been assigned by Human Resources for the purpose of ensuring her whereabouts were unknown by coworkers.

457.     As a direct and proximate result of defendant's actions and inactions, plaintiff has suffered monetary and non-monetary harms, including but not limited to, damage to her reputation, personal humiliation, and mental anguish and suffering and will continue to suffer damages in an amount to be proven at trial.

458.     Defendant acted with recklessness and/or serious and deliberate indifference to or disregard for Ms. Doe's rights pursuant to NYSHRL and therefore Ms. Doe also seeks punitive damages.

## AS FOR AN EIGHTH CAUSE

### Retaliation
### in Violation of New York State Labor Law § 740

459.     Plaintiff repeats and restates the allegations contained in the prior paragraphs of this complaint as if set forth more fully herein.

460.     Plaintiff repeats and restates the allegations contained in the prior paragraphs of this complaint as if set forth more fully herein.

461.     Defendant City is Ms. Doe's employer as defined by New York State Labor Law (NYLL) and Ms. Doe is defendant City's employee as that term is defined by NYLL.

462.     Defendant City is subject to NYLL § 27-a and its associated regulations Public Employees' Occupational Safety and Health Standards (PEOSHS) located at 12 NYCRR §§ 800.1 et seq.

463.     NYLL imposes a duty on public employers for the benefit of their employees, namely to ensure for the protection of the lives, safety and health of public employees in compliance with the mandates of Labor Law, section 27-a.

464.     Ms. Doe reported breaches of NYLL § 27-a and PEOSHS when she reported to many RFD supervisory staff that RFD's failure to respond to her reasonable concerns Mr. Smith would return to her place of employment and cause death or serious physical harm to her and/or her co-workers was in violation of the law, as more fully described above.

465.     Ms. Doe reported breaches of NYLL § 27-a and PEOSHS when she reported to many RFD supervisory staff RFD's failures to address her reasonable concerns Mr. Smith would determine her leave status due to her co-workers sharing this information with Mr. Smith allowing him to find her and/or her co-workers and cause her death or serious physical harm, was in violation of the law, as more fully described above.

466.     After reporting breaches, RFD retaliated against Ms. Doe when it;
  a.  permitted retaliatory harassment including, but not limited to,
       i.   Permitting negative rumors to persist regarding Ms. Doe's ability as a firefighter, in relation to the domestic violence victimization she experienced.
       ii.  Mr. Santiago telling RFD members Ms. Doe had "lawyered up" and sought to bring "a claim" against the RFD and should be careful about what they say to her.

      iii.   RFD leaders asked Ms. Doe's firefighter colleagues to "document" their experiences with Ms. Doe.

      iv.   Chief Hartman appeared to supervise nearly every call Ms. Doe's company was called out to.

      v.   Telling Ms. Doe RFD leadership felt she was writing too many IDCs about workplace violence, and if she wrote one more, they would put her out of work as "mentally unfit for duty."

      vi.   Dr. Nichols questioning why she did not report to work after Ms. Doe had already emailed Dr. Nichols explaining she needed to take domestic violence leave to have meetings with law enforcement, to safety plan, meet with legal counsel and obtain counseling and medical treatment.

      vii.   Dr. Nichols repeatedly asked for the date of Ms. Doe's surgery despite (1) Ms. Doe's repeated explanations for why she could not share the date and (2) the practice of the RFD to call off four hours before a shift, not weeks in advance.

      viii.   Ms. Kingsley emailed Ms. Doe on September 7, 2023 and instructed Ms. Doe to stop talking about domestic violence and tell defendant City the date of her surgery.

b.   Refused to discuss Ms. Doe's safety concerns unless she shared information about her upcoming surgery with Dr. Nichols when no other firefighter is required to share this type of information in advance.

c.   Stopped paying Ms. Doe on January 1, 2024, and claiming she was on an "unauthorized absence."

d.   Did not include her on the list of RFD employees to Lifetime Benefit Solutions (which oversees Ms. Doe's HSA) for the first time since her hire and was therefore unenrolled.

e.   Sent a Civil Service Section 75 hearing charge letter signed by RFD Fire Chief Napolitano alleging Ms. Doe was responsible for "unauthorized absences" and "failure to report sick leave."

467.     As a direct and proximate result of defendant's actions and inactions, plaintiff has suffered monetary and non-monetary harms, including but not limited to, damage to her reputation, personal humiliation, and mental anguish and suffering and will continue to suffer damages in an amount to be proven at trial.

## AS FOR AN NINTH CAUSE

### Negligence Per Se
### Against Defendant City of Rochester

468.    Plaintiff repeats and restates the allegations contained in the prior paragraphs of this complaint as if set forth more fully herein.

469.    Defendant City is Ms. Doe's employer as defined by NYSHRL and defined by New York State Labor Law (NYLL) and Ms. Doe is defendant City's employee as defined by NYSHRL and as that term is defined by NYLL.

470.    Defendant City did not comply with NYSHRL as more fully described above.

471.    Defendant City acted with recklessness and/or serious indifference to or disregard for Ms. Doe's rights pursuant to NYSHRL.

472.    Defendant City is subject to NYLL § 27-a Safety and health standards for public employees and its associated regulations Public employees' occupational safety and health standards (PEOSHS). 12 NYCRR §§ 800.1 et seq.

473.    NYLL imposes a duty on public employers for the benefit of their employees, namely to ensure for the protection of the lives, safety and health of public employees in compliance with the mandates of Labor Law, section 27-a.

474.    Ms. Doe reported breaches of NYLL § 27-a and PEOSHS when she reported her reasonable concerns Mr. Smith would return to her place of employment and cause death or serious physical harm to her and/or her co-workers and requested her employer intervene to prevent his ability to do so, as more fully described above.

475.    Ms. Doe reported breaches of NYLL § 27-a and PEOSHS when she reported her reasonable concerns Mr. Smith would determine her work location and/or her leave status due to her co-workers sharing it with Mr. Smith allowing him to find her and/or her co-workers and cause her death or serious physical harm and requested her employer intervene to prevent his ability to do so, as more fully described above.

476.    Specifically, Ms. Doe reported concerns of workplace violence to defendant City's supervisory employees on at least twelve (12) occasions, almost all of which were documented in writing.

477.    Defendant City did not respond to Ms. Doe's report of workplace violence in the manner required by NYLL.

478.    Instead, defendant City acted with recklessness and/or serious and deliberate but not limited to, having a supervisory staff member pull Ms. Doe aside to inform her she would be deemed mentally unfit for duty if she wrote one more report about her concerns of workplace violence.

479.    As a direct and proximate result of defendant's actions and inactions, plaintiff has suffered monetary and non-monetary harms, including but not limited to, damage to her reputation, personal humiliation, and mental anguish and suffering and will continue to suffer damages in an amount to be proven at trial.

**WHEREFORE**, by reason of the foregoing, plaintiff hereby respectfully requests the following relief:

A. A declaratory judgment that the actions, conduct, and practices of defendant complained of herein violate the laws of the United States and the State of New York;

B. An injunction and order permanently restraining defendant from engaging in such unlawful conduct;

C. An order directing defendant to place plaintiff in the position she would have occupied but for defendant's discriminatory, retaliatory, and/or otherwise unlawful treatment of plaintiff, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and other unlawful conduct are eliminated and do not continue to affect plaintiff;

D. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate plaintiff for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security, and other benefits of employment;

E. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate plaintiff for harm to plaintiff's professional and personal reputation and loss of career fulfillment;

F. An award of damages for any and all other monetary and/or non-monetary losses suffered by plaintiff in an amount to be determined at trial, plus prejudgment interest;

G. An award of costs that plaintiff has incurred in this action, as well as plaintiff's reasonable attorney's fees to the fullest extent permitted by law;

H. An award of punitive damages to redress defendant City's intentional and/or reckless conduct; and

I. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.


Dated: Fairport, New York
        April 9, 2024

                                J. Morgan Levy Firm, PLLC


                                J. Morgan Levy, Esq.
                                Attorney for Plaintiffs
                                24 N. Main St., Suite 2
                                Fairport, NY 14450
                                Tel. 585-678-1160
                                Email: morgan@jmorganlevyfirm.com